THE SENATOR D. C. CHASE.

THE COMMODORE PERRY.

LEHIGH VALLEY COAL CO. *v.* THE SENATOR D. C. CHASE and THE COMMODORE PERRY.

*(District Court, S. D. New York. December 4, 1890.)*

COLLISION—EAST RIVER—TOWAGE LIGHTS—NARROW PASSAGE—DISREGARDING SIGNALS —FALSE LIGHTS—PROXIMATE CAUSE.

The ferry-boat C. P., in going down the East river at night, undertook to go between a schooner and a tug coming up about 150 feet apart; the latter having 3 coal-boats lashed to her starboard side. The tow along-side the tug was not seen until very near, and, in passing, the paddle-wheel of the ferry-boat ran over and sunk the outside boat of the tow. The schooner and the tug were considerably on the New York side of the river, the latter about 350 feet from the docks, and two-thirds of the river to the eastward were free and unobstructed. The tug exhibited the usual colored lights, and the required two white vertical lights, indicating a tow. *Held,* that the ferry-boat was in fault for undertaking to pass unnecessarily through the narrow passage between the schooner and the tow; that no rule or settled usage required lights on the tow along-side; and that the alleged illegal practice of tugs to carry two vertical white lights without a tow was not proved, and would not justify the ferry-boat in assuming that there was no tow along-side because additional side lights were not seen; that the navigation of the tug near the piers was not a proximate cause of collision; and that the ferry-boat was solely to blame.

In Admiralty. Libel for collision.

*Wing, Shoudy & Putnam* and *Mr. Burlingham*, for libelants.
*Wilcox, Adams & Macklin*, for the Commodore Perry.
*E. D. McCarthy*, for the Senator D. C. Chase.

BROWN, J.    A little before 7 o'clock in the evening of March 25, 1890, the libelants' boat, Chunker, No. 2,111, loaded with coal, in tow of the tug D. C. Chase, alongside, and being the third and outside boat on the tug's starboard side, while going up the East river came into collision with the paddle-box of the ferry-boat Commodore Perry, which was on her way from Grand street, Williamsburg, to Grand street, New York, and was thereby sunk.    The cargo was afterwards raised, and the above libel was filed for the damage to the boat.    There is considerable conflict in the testimony as to the precise place of the collision.    The Chunker was found sunk immediately abreast of the Stanton-Street pier.    From the other testimony in the case I am satisfied that the Chunker could not have run more than 500 or 600 feet after she was struck, so that the place of collision was probably a little above Rivington street, and at least 800 feet above the New York slip for which the Commodore Perry was bound.    All the evidence concurs in placing the Chunker at the time of collision not over 350 feet outside of the New York docks; many of the witnesses place her much nearer.    A schooner was at the same time coming up the East river with a free wind, and passing the tug on the easterly side of her.    The ferry-boat undertook to go down between the schooner and the tug.    In doing so she passed extremely near the booms of the schooner, and with her paddle-box struck the Chunker near her stern.

I am obliged to find that the blame for this collision rests upon the ferry-boat, for undertaking to go between the schooner and the tow.    The evidence shows that there was no necessity for taking this course.    The schooner was considerably upon the New York side of the river, estimated to be not over 150 feet outside of the tug, and coming straight up the river, and nearly parallel with the course of the tug.    The course of the ferry-boat when some 300 yards distant was not straight down river, but somewhat angling towards the New York shore, being headed about for her slip, or a little below it.    The schooner then showed both her colored lights to the ferry-boat, and she bore a little off the ferry-boat's port bow, because the ferry-boat was headed somewhat on the New York shore; and the ferry-boat must at that time have been at least as far from the New York shore as the schooner, and I think further.    Two-thirds of the river on the Brooklyn side were clear, and there was nothing to prevent the ferry-boat's passing to the eastward of the schooner, as the ferry-boat Dakota did a few moments earlier.    In so doing the situation was not one likely to involve any difficulty or embarrassment to the ferry-boat in entering her slip.

In behalf of the ferry-boat, it is urged that the loaded Chunker was so low in the water that she could not be seen until the ferry-boat had approached so near as to make collision unavoidable; and that it was the common practice, and the tug's duty, in the case of such wide tows, to

show lights on the outside of the tow, to indicate its position. Other evidence, however, proves that three boats on one side of the tug are not at all unusual, and that there is no general practice for tows to carry lights when along-side, but only when upon a hawser behind the tug. There are no rules or valid regulations that required any other lights than those exhibited by the tug in this case, namely, the usual colored lights and the two vertical mast-head lights, which the tug exhibited, and which are the special signal of a tow. Rev. St. § 4233, rules 2, 4; *U. S.* v. *Miller*, 26 Fed. Rep. 95, 100.

As against the inference that the ferry-boat should have drawn from this signal, it was urged that it is so common for tugs to carry such vertical lights about this harbor and in the East river without having any tow, that the ferry-boat was not required to act on the presumption that there was a tow along-side of the tug merely from observing her two vertical white lights, but only in case some lights were also seen on the tow itself, to indicate its presence. The evidence does show that two such vertical lights are not unfrequently seen on tugs without a tow. But I am not satisfied from the evidence that this occurs to any considerable extent, or otherwise than in immediate connection with towage, such as the previous fixing of the lights when the tug is about to take a tow, or from leaving them in place for a time through inadvertence, perhaps, after a tow has been discharged. If there is any such practice beyond this, or if this is carried to such an extent as to cause any embarrassment to other vessels, it is the plain duty of all interested to make complaint, and secure proper punishment for the carrying of false lights. In any event, it is impossible to admit such an unlawful practice to justify other vessels in disregarding the prescribed signals that indicate a tow, or in acting on the assumption that there is no tow when they are approaching near to a tug that displays the towage signals; and, if they do so, they take the risk of the fact as it may turn out to be.

I do not perceive any material fault in the tug. She was indeed proceeding along the New York shore, but that was here immaterial, for she was quite out of the way of the ferry-boat. *The F. M. Wilson*, 7 Ben. 367; *The Britannia*, 34 Fed. Rep. 558; *Cayzer* v. *Carron Co.*, L. R. 9 App. Cas. 873. Both were seen by each other, and their courses were perfectly understood. For a considerable distance before collision they were showing green to green. The starboard wheel was at first a proper movement by the tug to go nearer the New York shore, and to give the ferry-boat still more room, when she was seen approaching near; and the port wheel, when very near, was equally proper to swing the stern to port as much as possible. Neither of these maneuvers *in extremis* is to be regarded as the causes of the collision, even if they were not the best, which is by no means certain.

Decree for the libelant against the Perry, with costs, and dismissing the libel as to the Chase, with costs.